a bankruptcy case. Good morning, Your Honors. Good morning, Ms. Smith. If it please the Court, my name is Patricia Smith. I represent... You have to talk louder because Judge Barth is a hundred miles away. Very well. I represent the Appellant, Executive Sounding Board Associates, Inc., the trustee... You're going to have to talk louder than that, Ms. Smith. Yes, Judge. Put the microphone a little bit closer to you. How is this, Judge? That's much better. Thank you. I represent the Executive Sounding Board Associates, Inc., the trustee of the Blake Creditor Trust, which is the successor to the Official Committee of Unsecured Creditors of Blake of Chicago. If it please the Court, I would like to reserve five minutes for rebuttal. That's granted. Thank you, Your Honor. Now, the Committee of Unsecured Creditors filed this appeal to prevent the seizure by the buyer in a 363 bankruptcy sale. The buyer is pressed, I have the appellee here, of certain assets of the bankruptcy estate that were not included in the 363 sale that was approved by the Bankruptcy Court. Well, that's the issue. It is the issue. I mean, the issue is whether they were or were not included. That's correct, Your Honor. You're putting the rabbit in the hat. But it's your position that they were not. It is our position that they were clearly excluded from the sale. Now, the Creditors Committee actively participated in the bankruptcy case. In particular, the committee actively participated in all of the procedural and substantive hearings that related to the proposed 363 sale with Prestec as the stalking horse bidder. In this case, it's... What is stalking horse? I see that in the briefs. It essentially simply means that Prestec is putting itself out as the initial bid that the other bidders can attempt to match. It's a term of art, and I frankly don't know the origin of it, Judge. It actually derives from hunting, but I don't take your time. Thank you, Judge. In this case, as in many bankruptcy cases, the 363 sale was the single most important economic event for the unsecured creditors because that had the potential to provide substantial funds for distribution to the unsecured creditors. The Abilene, Prestec, insisted on a very tight schedule for consideration of the sale. In fact, the APA, the Asset Purchase Agreement, was dated the same day as the bankruptcy was filed, and it was only four months later, less than four months later, that the sale closed. In fact, the sale was on so tight a schedule that two interested parties did not have time to complete their bids. Let's get to the main point. The APA, which you just mentioned, specifically provides that the purchaser, i.e. Prestec, ultimately, shall purchase and acquire from the sellers, among other things, all inventories of the sellers, and all other contracts and outstanding offers for solicitations, etc., and the rights of seller relating to deposits and prepaid expenses, claims for refunds, and rights to offset. Now, in light of that explicit statement as to what is included, why wasn't the bankruptcy court and then the district court correct in holding that Prestec did get these rights? In the contract with Mitsubishi? Yes, Your Honor. Two reasons. First, we believe the APA clearly made that post-petition contract with Mitsubishi an excluded asset. Secondly, Would you repeat that, please? Yes. What you just said about the APA. Yes, Your Honor. The committee's position is that the APA clearly made the post-petition contract an excluded asset. Under the terms of the APA, there is a very broad grant of transfer of assets, as Judge Slaughter has just indicated, under Section 2.1 of the APA. But that entire grant is subject to the excluded assets. As a matter of fact, it expressly excludes all of the excluded assets. So to determine what's being purchased, one must look at Section 2.2, the excluded assets section. Now, the excluded assets section includes all of the seller contracts listed on a certain Schedule 3.21. Now, Schedule 3.21 does not specifically list seller contracts, but instead refers to see the attached list of contract vendors and customers. And there's no question that Mitsubishi was a contract vendor. But we do know that certain assets have been set forth in Section 2 of the APA. And Judge Slaughter, in her question, among other things, referred to inventories. And we have a definition of inventories here as including materials and supplies to be used or consumed by seller or its subsidiaries in the production of finished goods. Why doesn't this pipeline inventory held by Mitsubishi qualify as inventory? Because the inventories is defined in the asset purchase agreement as all inventories of the seller or its subsidiaries, wherever located. And it is a broad provision, but it makes it of the sellers. It must be property of the sellers in order to be inventories within this definition. Where does that appear? That is in the definitions provision of the asset purchase agreement, which is within the first few pages of the asset purchase agreement. Ms. Smoot. Yes, Your Honor. Do I understand that your position is that this was not A.B. Dick's work in progress because title had not passed to A.B. Dick, even though they had paid half of the amount that Mitsubishi charged? Is that your position? If the focus is on the term inventories. Is that your position that because the title hadn't passed, that therefore it was not the seller's property? That is one of our positions. Yes, it was not the seller's property. And in addition, the entire provision of the asset purchase agreement that transferred assets, including the transfer of inventories, was subject to the excluded assets. And if this post-petition contract was an excluded asset, as we claim it was, then it comes out no matter what Section 2.1 provides. Now, I don't understand something. Yes, Your Honor. As I understand it, PressTech paid $40 million in order to obtain the inventories, among other things, that are listed in the APA. That proves work in progress. When that $40 million was the purchase price, one of the provisions was that there had to be $22.7 million in working capital. When working capital included the inventories, why would they pay $40 million and not get all of the inventories? Several things, Your Honor. First, we don't believe this falls within the definition of inventories. Secondly, the approval order specifically reserved to the debtor the right to assign this contract in the future. That contract was taken out regardless of what happened up to the date of the approval order. But that's prospective, is it not? Doesn't that pertain to those assignments and to those assumptions that occurred in the future after the transaction that is in question had been completed? The sentence immediately preceding it says, Nothing in this order constitutes an assumption or an assignment of either of these contracts. This contract was an excluded asset, and consequently, all of the debtor's rights claims against third parties under Section 2.2J is also an excluded asset. This was excluded in two ways from this transaction. I know your red light is on. Yes, it is. That's all right. My colleagues will let me continue with the question. And that is, there is a specific inclusion of all rights of seller relating to deposits and prepaid expenses and claims for refunds. Now, are you saying that the contract gave with one hand and took away with the other and exactly the same thing? Same assets? I mean, that can't be the way we construe a contract. Your Honor, this contract, before you even get to the section that says inventories, Section 2.1 in the introductory paragraph says including the following but excluding the excluded assets. Nothing that follows that language matters at all if this was an excluded asset. Nothing matters. Well, except that if you specifically included, as they did with respect to deposits and claims for refund, then that's what I understand the creditor's committee is trying to say it has. And the debtor and Prestak expressly gay assigned its right thereafter to Prestak. I don't know what offsets the specific statement, which also says but excluding the excluded assets, and then says this is what the purchaser gets, and that includes the rights of the seller to the deposits. I'm not sure that the same little subsection says, you know, except for that which is not excluded. So it can't give, in the same line, can't give and take away, you know, otherwise, what other rights did the seller have relating to deposits if it wasn't the Mitsubishi contract? I believe they were purchasing from other vendors as well, but But you would say that they're not included also. Unless the contract was specifically listed as one of the assumed seller contracts, it wouldn't be included. But to answer Your Honor's question further, the most specific treatment, you're referring to the specific treatment of deposits and refunds, but the most specific treatment of what was at issue here is in the approval order, and that's a specific reservation of the rights of the debtor to this particular contract. The debtor could not have reserved those rights and given it away at the same time. Okay, I think we understand your position. Is it all right, Judge Barth, if we let her sit down and then hear from the other side? Judge Smith? Okay, we'll get you back. We may have more questions. Thank you. May it please the Court, James Sullivan of McDermott Law & Emory, on behalf of the Appellate Prestec, Inc. Your Honors, I sat there listening to the arguments of the Appellant's Counsel, and her argument as to what the APA must mean turns the APA on its head. It would make the interpretation that she gives such a strained interpretation that would not give Prestec the benefit of its bargain. It would be more than $40 million for these assets, and this contract was amended twice. The amendments were negotiated on the record before the bankruptcy judge. Counsel for one of the financial advisors for the debtors testified at both hearings, both at the August 23 hearing and the November 2 hearing, both one in connection with the bidding procedures order, one in connection with the sale order. During the testimony, it was very, very specific, and I can point you to the specific references if you want to take a look at it. It's A223 and A891. Both times, the financial advisor for the debtor testified that if the contract were not amended such that Prestec gave the debtors a credit for the prepaid inventory with respect to Mitsubishi, and it specifically mentioned the Mitsubishi inventory on the record, and that this is what it was being tied to, that if they didn't give them a credit in the working capital covenant, then the debtors would not get the benefit of the prepaid inventory in connection with the sale transaction. Now, that's not on 222, did you say? Sir, A223, Your Honor. Yeah, okay. I see it. Thank you. And later on in A891. That language makes – that recitation makes absolutely no sense if there was a contrary understanding. Did the creditors' committee representatives stand up at either hearing and say, Your Honor, that's not what the APA does. Prestec does not get the benefit of any prepaid inventory under the APA. No, they did not. They sat by idly, waiting until after the transaction had closed, after the parties had acted upon what their clear understanding of the agreement was. The bankruptcy judge also acted on that in approving the bidding procedures order as well as the sales order. It's just too late. We can't stand up and equitably and justly try to upend a bargain-for agreement, which was set forth on the record. All parties had an opportunity to kind of put their word in, and they sat by idly, just waiting for it to happen. It's just an unfair – So where does the prepaid inventory fit in under the APA? Under the APA, it either falls within – well, first of all, the definition is extremely broad. It includes all things, including – and it lists a whole bunch of things. The definition of inventories is extremely broad. And it not only includes, as you put it, a lot of things. It includes sellers not just titled, but right titled and interest. That's correct, Your Honor. And as Your Honor knows – Because there is a suggestion, I think, somewhere in the appellant's brief that the seller did not type here, which, even if it is correct, does not match the breadth of this convention, which was for right titled and interest. That's exactly right, Your Honor. And as Your Honor knows from probably numerous bankruptcy cases that appeared before you, Section 541 of the Bankruptcy Code interprets a property interest extremely broadly, which would include not only legal title to things, but also equitable title. So clearly, when you look at the explicit language of the contract, as well as the context of this being a bankruptcy case, unquestionably, that language certainly includes the debtor's type of interest in the prepaid inventory. So what is the import of Paragraph 9 of the Court's approval? That's really a red herring in terms of this issue, Your Honor. Paragraph 9 was included at the insistence of Mitsubishi. Its concerns, which were expressed on the record on numerous hearings in this case, was that they didn't want to make – they wanted to make sure that if these assets were sold, it was not going to be sold free, clear, whatever interest they had in the contract. For example, if for some reason Prestec did not complete the purchase of the prepaid inventory as contemplated, they wanted to be able to resell the inventory and not have to worry about violating Prestec, the intellectual property rights Prestec acquired as part of the closing. That was their concern. What is this all about? What product are we talking about? What is the inventory of? Basically, they're custom plates which are inserted into machines which ABDIC manufactured and sold. And are manufactured by Mitsubishi? The plates were manufactured by Mitsubishi at the request of ABDIC. And they bear the ABDIC name on them? Is that correct? They only go into these ABDIC machines. And so there would really be of no value to really anybody but ABDIC or somebody who had the right to sell ABDIC machines. I'm sorry. I interrupted you because all through the briefs they talk about inventory and you have to look very hard into the record to find out what we're really talking about. Okay. These are printing and imaging machines that are – Okay. That's helpful. I'm sorry. I don't know. I may have interrupted you. That's okay. I think I was pretty much done with the question. You were talking about the order and the fact that this was because of Mitsubishi's interest in being sure that if Prestec didn't pay the entire amount of the contract that it could then resell the inventory. That's where you were. Right. Because typically in a bankruptcy – when you're talking about a bankruptcy sale pursuant to Section 363 of the Bankruptcy Code, sales are typically free and clear of rights and claims and interests and the like. And they just wanted to make sure that this sale was not going to be free and clear of whatever rights they had to resell the inventory with a license from the debtor. And that's what they were concerned about. Certainly, Paragraph 9 can be read in harmony with what the APA did, which was to convey whatever interest the debtor had in the prepaid inventory to Prestec. Not as some kind of carve-out. That's exactly right, Your Honor. It doesn't say anything about an exclusion. All it says is that nothing in this paragraph shall be deemed to be an assumption or an assumption in the assignment of these contracts. That's all it says. Judge Barr, do you have any questions? Yes, I do have a question. As I understand it, the working capital, which was designed to be $22 million set – I'm correcting that, am I not? That's correct, Your Honor. – consists of a country, state, and inventory. That's correct. The working capital is. Correct? Correct. If A.B. Dick had paid for all of the inventory in advance and had then disposed of it, there would be no issue here, would there? By disposing of it? Would there have been an issue of working capital? No, Your Honor. As long as they had at least $22.7 million of either receivables or actual inventory, whether prepaid or not, Your Honor's assumption is that it would have been fully paid for, then you're right. There would be no issue. Would the condition of $22.7 million have been satisfied? It would not, Your Honor. There was testimony at the sale hearing that the debtors would not have been able to satisfy that covenant but for the amendment which gave them the ability to count prepaid inventory or partially prepaid inventory against the working capital covenant. And there was actually testimony on the record that that amendment was of value to the debtors of at least – just even the second amendment was independently worth at least $1.7 million to the debtor. So how it could be worth that amount as opposed to some other amount, it just doesn't make any sense. The testimony would have been absurd if the appellant's interpretation of the contract were accepted. The working capital covenant, is that section 10.12? That's correct, Your Honor. Okay. And who else? Do you have any more questions? Leonard, do you have any more questions? I'm sorry, I didn't hear that. I said – I asked, do you have any more questions? No, I do not. I'm sorry. Do you have anything more you want to tell us? No, Your Honor. I mean, my goal here was to make sure that all of your questions were answered. I think the papers were fairly clear. I think the language of the agreements were clear. Well, I can't say the papers were all so clear. It took a lot of work to work through them. But we ultimately – maybe we ultimately did that. Okay, well, maybe that's perhaps why you asked for oral argument. But I think at the end of the day, you know, I think, you know, certainly the judges below understand what the transactions were about. They had the – they had this – a complete record of exactly what happened step by step. Is there anything in either the bankruptcy court's decision or order or the district court's decision or order with which you disagree? Or do you agree with it as it is? Well, certainly I agree with the conclusion. I mean, I wouldn't say that there's anything specifically that I would disagree. To the extent that there was any disagreements that were immaterial, then I don't think – Yeah, but is there anything that isn't in one or both of those decisions that this court has to clarify? I don't think so, Your Honor. I think, you know, they were pretty straightforward opinions. They got to the heart of the matter pretty quickly. And, you know, certainly I think, you know, the court could have ruled in our favor any number of ways. I don't think that there's any real way to rule in the appellant's favor without really upending the bargain for agreement between Prestek and the debtors. Okay. Thank you very much. Thank you, Your Honor. Thank you. Mr. Solomon. Have you missed this? Thank you, Your Honor. I would like to address first the discussion about this working capital covenant. There was discussion as to the working capital covenant having been some understanding early on when the negotiation for the amendments were made that Prestek was going to acquire these deposits on inventory even if it wasn't counted in the working capital provision, section 1012. But, in fact, that discussion – first of all, the committee never took that position. The committee's position was this working capital covenant, section 1012, is unattainable. And because it's unattainable, this APA becomes nothing more than an option. And Prestek can walk away from it at the 11th hour and leave the debtor with no buyer whatsoever. The problem could as easily have been resolved by a reduction in the amount of the working capital covenant as it could be by counting something that didn't belong to the debtor and might not ever be acquired by Prestek. The comments made by the debtor's consultant were made, I presume, on his assumption that Prestek would not walk away from this Mitsubishi contract. But it was made approximately six weeks before Prestek even had to say which contracts it was going to list as assumed seller contracts. For all anyone knew, this post-petition contract would have been included. In addition, it was long before the approval order was negotiated. And there was a negotiated order. A concession was made there, and it was a concession the committee relied on. What was the down payment made on this inventory? The payments made on the inventory were over the course of several months beginning in August of 2004 up until the date of the approval order. They were all post-petition payments? They were post-petition payments. The agreement they were made under were post-petition payments. What ultimately happened, however, was that when it came time for Prestek to designate assumed seller contracts, it did not designate the post-petition contract. That left it an excluded asset under the APA, wiping out everything that had come before because that was the only way for them to acquire it. Rights under that contract, claims under that contract are also excluded assets. And to make it perfectly clear, the asset purchase agreement reserves to the debtor the right to assume and assign in the future. That has nothing whatever to do with Mitsubishi's resale rights. Sure, there's provisions in Paragraph 9 of the approval order that protects Mitsubishi's resale rights, but there would be no reason for Mitsubishi to reserve rights on behalf of the debtor. In addition, Your Honor asked whether there were any errors in the rulings of the bankruptcy court. Any material errors. Any material errors. Well, I know you don't agree with it, period. We don't agree with it, period, but there's a very material error that goes right to the heart of this issue as to why the judge would believe Prestek was entitled to this deposit on inventory, which was essentially a refund right under an excluded contract. The bankruptcy judge, we will say apprehended that Prestek, not the debtor, Prestek had made those partial payments twice in his ruling. At page A727 and A728, the bankruptcy judge indicates that Prestek made that payment. He says the debtors, through Prestek, paid MPM, that's Mitsubishi, $2,545,774 with the remaining balance to be due and payable upon delivery of the product. That was the partial payment, and it's beyond refute that the debtor made that payment. And it appears, for instance, Prestek admits it at A653. The judge says the same thing at A728. It's a clear error by this bankruptcy judge, a clear misunderstanding. This was an excluded contract. These were rights reserved to the debtor. This was very important to the creditors committee who relied on this approval order, and it calls into question the validity of the bankruptcy sales and the integrity of bankruptcy sales in this circuit. If the creditors committee cannot rely, I'm out of time. Judge Barth, did you have any questions? I do not. Judge Smith? No, thank you. Okay. Thank you very much. Thank you, Your Honor. Thank you both. It's a complicated case, and we will take it under advisement. Thank you both. We will, as soon as they take their papers away.